UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERNEST EMMANUEL PEEPLES,

       Plaintiff,

v.                                Civil Case No. 18-14049
                                   Honorable Linda V. Parker

WAYNE STATE UNIVERSITY,
JOHN WOLF, JILL DION,
CHERYL TURSKI, MATTHEW SEEGER,
MICHAEL J. BARNES, and
LORALEIGH KEASHLY,

       Defendants,

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR DISMISSAL OR SUMMARY JUDGMENT

       Plaintiff initiated this action after being dismissed from the Master of Fine Arts ("MFA") Hilberry Acting Program at Defendant Wayne State University ("WSU"). In his Complaint, Plaintiff alleges: (1) disability discrimination and a failure to accommodate in violation of the Americans with Disabilities Act ("ADA"); (2) disability discrimination in violation of Section 504 of the Rehabilitation Act of 1973; (3) race and disability discrimination in violation of Michigan's Elliot Larsen Civil Rights Act ("ELCRA"); (4) retaliation in violation of ELCRA; (5) violations of his Fourteenth Amendment substantive and

procedural due process rights under 42 U.S.C. § 1983; and (6) race discrimination in violation of Title IX of the Education Amendments of 1972.

The matter is presently before the Court on Defendants' "Motion for Dismissal or Summary Judgment Pursuant to [Federal Rules of Civil Procedure] 12(b) and 56." (ECF No. 44.)  The motion has been fully briefed.  (ECF Nos. 50, 54.)  Finding the facts and legal arguments adequately presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.    Applicable Standards

A defendant is entitled to dismissal under Rule 12(c) when the factual allegations in the complaint fail "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The central inquiry when evaluating a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of

2

an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

Rule 56 provides:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to *particular* parts of materials in the record including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials.

Fed. R. Civ. P. 56(c)(1) (emphasis added). The trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d

3

1029, 1034 (D.C. Cir. 1988)) ("the trial court no longer has a duty to search the

entire record to establish that it is bereft of a genuine issue of material fact"); *see*

*also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*

494 U.S. 1091 (1990) ("A district court is not required to speculate on which

portion of the record the nonmoving party relies, nor is it obligated to wade

through and search the entire record for some specific facts that might support the

nonmoving party's claim."). The parties are required to designate with specificity

the portions of the record such that the court can "readily identify the facts upon

which the . . . party relies[.]"[1]  *InterRoyal Corp.*, 889 F.2d at 111.

---

[1] Plaintiff's counsel failed to comply with this requirement and Rule 56(c)(1). Most of the factual assertions in the response brief are not followed by any citation to the record. Further, the brief is not in compliance with the Local Rules for the Eastern District of Michigan or the District's Electronic Filing Policies and Procedures, which are incorporated into the Local Rules. *See* E.D. Mich. LR 5.1(b)(1), (d)(1), 7.1. The brief lacks all of the requirements in Rule 7.1(d)(2) ("A brief supporting a motion or response must, at the beginning, contain a concise statement of the issues presented and, on the following page, the controlling or most appropriate authority for the relief sought. The brief may contain a table of contents, an index of authorities, and an index of exhibits attached to the brief.") The absence of an index of exhibits is most problematic because counsel filed the majority of the exhibits as single documents in violation of Rule 19(b) of the Electronic Filing Policies and Procedures (*see* ECF Nos. 50-1, 51) and, even where properly filed as independent attachments, did not label the electronic record with a brief narrative description, as also required under Rule 19(b). This renders Plaintiff's citations to his exhibits—where there are any—impossible to locate in the electronic record. Plaintiff's counsel is directed to familiarize himself with these rules as any future filings before this Court by counsel that fail to comply will be stricken. *See* http://www.mied.uscourts.gov/local_rules; http://www.mied.uscourts.gov/electronic_filing_rules.

## II.   Factual Background

### A.   Plaintiff's Admission and Start at WSU

Plaintiff is African American and has albinism and diabetes.  He auditioned for admission to the MFA acting program in WSU's College of Fine, Performing and Communication Arts ("CFPCA") through the University Resident Theatre Association ("URTA") process.  As part of that process, many schools audition students in a large group setting and then have the opportunity to invite students back for individual interviews and/or callbacks.  (Turski Dep. at 7-8, ECF No. 44-2 at Pg ID 320-21; Pl. Dep. at 19, ECF No. 44-3 at Pg ID 332.)  Plaintiff received a callback from WSU.

At the callback, Plaintiff informed Defendant Cheryl Turski, a CFPCA Associate Professor and designated Head of Performance, that his diabetes may cause him to need breaks to check his blood sugar level and treat a low blood-sugar level.  (Pl. Dep. at 19-20, ECF No. 44-3 at Pg ID 332-33.)  Turski was "empathetic" and assured Plaintiff that there would be no issues if he needed extra time to handle these matters.  (*Id.* at 20, Pg ID 333.)  Plaintiff met with all of the CFPCA faculty, including Defendants Michael Barnes and Jill Dion, at which time he also informed them of his diabetes and asked questions to confirm he would receive the support at WSU that he needed for his conditions.  (Pl. Dep. at 28, 30, 32-33, ECF No. 53-12 at Pg ID 1576, 1578, 1580-81.)

Plaintiff was offered a position in the MFA program's Fall 2017 entering class, which he accepted.  The program is a small ensemble program and there were ten students in Plaintiff's entering class.  (Barnes Dep. at 14, ECF No. 44-4 at Pg ID 371; Turski Dep. at 7, ECF No. 44-2 at Pg ID 320.)  Four of the ten students were African American.  (Pl. Dep. at 218, ECF No. 44-3 at Pg ID 367.)  WSU also offered Plaintiff, and he accepted, a position as a graduate research assistant for the 2017-2018 academic year, which came with a stipend, insurance, and tuition assistance.  (Offer Letter, ECF No. 50-1 at Pg ID 718.)

On September 1, 2017, shortly after classes began, Plaintiff met with Cherise Frost, a Disability Specialist in WSU's Student Disabilities Services ("SDS").  At this meeting, Plaintiff requested accommodations for his diabetes and vision impairment related to his albinism.  Plaintiff received all of the accommodations he requested.  (Pl. Dep. at 74-75, ECF No. 44-3 at Pg ID 340-41; Frost Dep. at 82-83, ECF No. 44-5 at Pg ID 388-89.)  Frost informed Plaintiff that he could contact SDS at any time if he required changes or additions to his accommodations.  (Frost Dep. at 35, ECF No. 44-5 at Pg ID 385; Barnes Dep. at 90, ECF No. 44-4 at Pg ID 377.)  However, after his initial meeting with Frost on September 1 through the Fall 2017 semester, Plaintiff never contacted SDS to request any changes or additions to his accommodations.  (Pl. Dep. at 61, ECF No. 44-3 at Pg ID 336.)

6

Plaintiff's accommodations at WSU included that he "may need to request extended time on written assignments, due to the needs of his condition, as long as it does not fundamentally alter the essential elements of the course; to be discussed with professor." (Accommodations Letter, ECF No. 44-6 at Pg ID 393.) There were no accommodations related to attendance. (*See id.*) All of Plaintiff's instructors received a copy of the accommodations letter. (Pl. Dep. at 61, ECF No. 53-12 at Pg ID 1609.)

While Plaintiff was granted an attendance accommodation as an undergraduate student at Morehouse College (Morehouse College Letter, ECF No. 44-26 at Pg ID 504), he did not request such an accommodation during his initial meeting with SDS or during the Fall 2017 semester (Pl. Dep. at 61, 63-64, 74-75, ECF No. 44-3 at Pg ID 336, 340-41). Further, Plaintiff provided SDS with his accommodations letter from Morehouse only during the appeal of his dismissal from WSU. (*See* 1/4/18 email to Frost; ECF No. 44-6 at Pg ID 502.)

## B.     Plaintiff's Fall Semester Coursework & Course Requirements

During the Fall 2017 semester, Plaintiff's classes included "Voice and Speech I- Foundation of Voice for the Actor" (Voice I) and "Theatrical Movement- An introduction to Physical Awareness" ("Movement I"), taught by Barnes and Dion, respectively. These were mandatory courses for the theatre program. (Pl. Dep. at 75-76, ECF No. 53-12 at Pg ID 1623-24.) Plaintiff received

7

the syllabus for both classes at the start of the semester.  (*Id.* at 78-80, Pg ID 344-

345.)

Both courses had the identical attendance policy, which was set forth in the

syllabi:

> Attendance and punctuality are vital in a career of theatre.
> Thus, a strict policy of attendance and punctuality is in place to
> prepare students for working in the profession.  Chronic absences
> and lateness with not be tolerated. . . . Unavoidable emergencies
> will be handled on an individual basis.  Other than absences for a
> University-approved event or religious holiday, the instructor
> determines whether an absence or late attendance is acceptable . . .

> A daily attendance record will be kept.  <u>Students are allowed
> two absences.  Every absence thereafter, will effectively lower the
> student's final grade one letter value (10%).  Three late-arrivals
> equals one missed class</u>. . . .

(Voice I Syllabus, ECF No. 44-7 at Pg ID 396 (emphasis in original); Movement I

Syllabus, ECF No. 44-8 at Pg ID 404-05.)  The syllabus for Dion's class also

stated that "[a]lmost every Thursday," students must "submit a one-page response

to the previous week's work."  (Movement I Syllabus, ECF No. 44-8 at Pg ID

404.)  According to the syllabus, students also were required to attend two

professional productions and write a two-page paper reviewing the production.

(*Id.* at Pg ID 403.)  With respect to the deadline for these "performance reviews,"

the syllabus reads:

> This is due no more than ONE WEEK after your attendance of the
> performance and all reports must be received by the last day of
> class NOT ON THE DAY OF THE FINAL EXAM.  All reports

must  be printed and submitted in class with a ticket from the performance stapled to the front of the report.  No late reports will be accepted.

(*Id.* at Pg ID 403-04 (capitalization in original).)

> **1.    Voice I**

Plaintiff was absent for the second meeting of Voice I on September 6.  (*See* 9/6/17 Text Message; ECF No. 44-10; Attendance Record, ECF No. 44-13; Pl. Dep. at 80, ECF No. 44-3 at Pg ID 345.)  About 30 minutes before the 9:30 a.m. class began, Plaintiff texted Barnes indicating that he had been fighting a cold for approximately a week and that morning it "started affecting [his] numbers." (9/16/17 Text Message, ECF No. 44-10; Voice I Syllabus, ECF No. 44-7 at Pg ID 395.)  After that absence, Barnes reminded Plaintiff of the attendance policy's allowance of only two absences and that more than two absences would adversely affect his grade.  (Pl. Dep. at 93, ECF No. 44-3 at Pg ID 346.)

A few days later, on October 9, five minutes before class began (*see* Voice I Syllabus, ECF No. 44-7 at Pg ID 395), Plaintiff sent a text message to Barnes indicating that Plaintiff did not think he would make it to class because his bike had "some derailer issues" and while the mechanic said it would be a quick fix, he was "still waiting" (10/9/17 Text Message, ECF No. 44-11 at Pg ID 429).  Barnes responded: "You do realize that, if you miss today, any more absences after this will reduce your grade."  (*Id*.)  Plaintiff did come to class that day, albeit

approximately 35 minutes into the 50-minute class.  (Barnes Dep. at 100, ECF No.
44-4 at Pg ID 381.)

Two days later, on October 11, Plaintiff was again absent from Voice I.  (*See*
Attendance Record, ECF No. 44-13.)  A minute after class began, Plaintiff texted
Barnes, in part:  "Morning Michael.  As much as I don't want I have to use today
as my last absence.  My number [sic] are of whack [sic] and this second cold I
have is at its worst and I can barely [sic] or speak properly."  (10/11/17 Text
Message, ECF No. 44-12.)  After this absence, Barnes met with Plaintiff and
reminded him, again, that any further absences would result in a grade reduction.
(Pl. Dep. at 100, ECF No. 44-3 at Pg ID 348; Barnes Dep. at 88, ECF No. 44-4 at
Pg ID 375.)  At the meeting, Plaintiff informed Barnes that Plaintiff had an
endocrinologist appointment scheduled the following week which conflicted with
class.  (Pl. Dep. at 101-02, ECF No. 44-3 at Pg ID 349-50; Barnes Dep. at 37, ECF
No. 44-4 at Pg ID 373.)  Barnes indicated that the absence would be excused.  (*Id.*)
However, Barnes also told Plaintiff that any additional absences or late arrivals
would affect his grade.  (Pl. Dep. at 102, ECF No. 44-3 at Pg ID 350; Barnes Dep.
at 49, ECF No. 44-4 at Pg ID 374.)

Thereafter, Plaintiff did not have additional absences from Voice I but he
was tardy on five additional occasions.  (*See* Attendance Record, ECF No. 44-13.)
Cumulatively, Plaintiff had three absences from the class—none of which affected

10

his grade because two were permitted without doing so and the third was excused—and seven late arrivals.  (*Id.*)  Because three late arrivals constituted one absence, Plaintiff's seven late arrivals were the equivalent of two additional absences, resulting in his grade of 83.97% being reduced two levels to 63.97%. (*See* Voice I Syllabus, ECF No. 44-7 at Pg ID 396; Barnes Dep. at 31, ECF No. 44-4 at Pg ID 372.)

## 2.  Movement I

Plaintiff was absent from Movement I on three occasions and was tardy twice.  (Dion Dep. at 64, ECF No. 44-9 at Pg ID 420.)  Even before the grade-level reduction for these absences, Plaintiff's grade in the course was at failing level (69%) because he did not turn in at least one journal assignment, turned in one of the two required performance reviews after the last class, resulting in a 50% reduction, failed to turn in the second performance review at all, and received a 65% on the final exam.  (*Id.* at 36, 50, 63, ECF No. 44-9 at Pg ID 417-19.)

With respect to the two performance reviews, Plaintiff submitted one to Dion via email at 11:08 p.m. on December 11.  (12/11/17 Email, ECF No. 53-2.) The evening before, Plaintiff sent Dion a journal entry via email, which he admitted was "ludicrously late[.]"  (12/10/17 Email, ECF No. 44-14 at Pg ID 435.) In this December 10 email, Plaintiff promised to submit his performance review on Stop Kiss "soon[.]"  (*Id.* at Pg ID 436.)  Plaintiff contended that he saw "No Child

11

ages ago and started to write on it" but had lost the ticket and now realized he

needed to submit it with his review.  (*Id.*)  Plaintiff asked: "If you can't accept that

paper, would you accept one later this weekend on Swimming Upstream at the

Detroit Rep?"  (*Id.*)

Dion responded to Plaintiff's December 10 email the following day.  (*Id.* at

Pg ID 435.)  Dion wrote:

> In the future, you MUST reach out to me before the date that
> the journal is due to tell me that you are having issues with the .pdf.
> We had a conversation about this mid-semester when you were
> having problems with your modem.  I will give you half credit for
> this week's entry.  I cannot give you full credit for your entry
> because you did [sic] contact me.
>
> All performance reports are due on the last day of class.  That
> class is today.  Each performance report is due at least one week
> after your attendance of the performance.  All of this is outlined in
> the syllabus and was made clear verbally at the beginning of the
> semester.

(*Id.*)  In his 11:08 p.m. email to Dion on December 11, Plaintiff wrote, in part:  "I

understand.  Here is the one performance report on Stop Kiss.  I realize the

syllabus states that it should be printed with a ticket, by [sic] I have a clear

accommodation that allows for both extended time on assignments, their due dates,

and for all work to be allowed [sic] be completed and submitted electronically."

(12/11/17 Email, ECF No. 53-2.)

12

###### C.      Plaintiff's Dismissal

"The Ropes," which is "an official supplement" to the theatre department's "academic syllabi," provides that for graduate students any grade of B- or lower is considered "unsatisfactory and under certain circumstances constitute[s] valid cause for dropping a student from graduate study."[2]  (The Ropes at 4, ECF No. 44-16 at Pg ID 450.)  Any grade lower than a C- can only be entered into the system, or appears in the system regardless of how entered, as an F.  (Dion Dep. at 68, ECF No. 44-9 at Pg ID 421.)  "A grade of 'F' in any course is unacceptable and constitutes grounds for dismissal without delay."  (The Ropes at 5, ECF No. 44-16 at Pg ID 451; *see also* Pl. Dep. at 132, ECF No. 44-3 at Pg ID 352.)  The Ropes states that when a student is at risk of receiving an F, "a warning procedure will take place consisting of conferences along with written evaluations explaining how the potentially failing work must be corrected."  (The Ropes at 5, ECF No. 44-16 at Pg ID 451.)

Due to Plaintiff's failing grades in Dion's and Barnes' courses, he was automatically dismissed from the MFA program.  (Turski Dep. at 75-77, ECF No.

---

[2] Plaintiff argues that the theatre department's policies permit "a maximum of two grades of 'B-' [or lower] for a graduate student as long as they are balanced by a grade of 'A' in other classes of equal or greater credit . . . ."  (Pl. Resp. Br. at 16, ECF No. 50 at Pg ID 699 (bracketed language added by Plaintiff).)  The bracketed language, however, is not included in the actual policy.  (*See* The Ropes at 4, ECF No. 44-16 at Pg ID 450.)  This is critical, as the grades at issue were below a "B-".

44-2 at Pg ID 322-24.)  Turski and Barnes conveyed this news to Plaintiff at a

meeting on December 18, at which time they also provided him with a dismissal

letter.  (*Id.* at 115, Pg ID 326; Dismissal Letter, ECF No. 44-17.)  During the

meeting, Plaintiff was afforded the opportunity to respond.  (Turski Dep. at 117,

ECF No. 44-2 at Pg ID 328.)  Plaintiff also had individual follow-up meetings with

Barnes, Turski, Dion, and Wolf.  (Pl. Dep. at 154-55, ECF No. 53-12 at Pg ID

1703-04; Voice I Appeal at 2-3, ECF No. 44-19 at Pg ID 459-50.)

Plaintiff appealed the failing grades and dismissal decision.  CFPCA's

official appeal procedure instructs students to first address disputes over grades

informally with the instructor.  (Appeal Procedure, ECF No. 44-18 at Pg ID 455.)

If dissatisfied, the student may then seek a formal appeal which begins with a

written appeal, addressed to the instructor.  (*Id.*)  Next, the student may appeal to

the department chair, then the CFPCA dean, and then the provost.

Plaintiff submitted a written appeal to Barnes but not Dion.  (Written

Appeal, ECF No. 44-19; Dion Dep. at 88, ECF No. 44-9 at Pg ID 425; Keashly

Dep. at 202, ECF No. 50-1 at Pg ID 966; Wolf Dep. at 207, ECF No. 44-21 at Pg

ID 482.)  Barnes failed to respond to Plaintiff's written appeal within the required

ten days.  (*See* Appeal Procedure ¶ 1, ECF No. 44-18 at Pg ID 455; 2/14/18 Letter,

ECF No. 51 at Pg ID 987.)  As Barnes explained to Plaintiff when he finally

answered the appeal, Barnes did not realize that he needed to provide a written

14

response, as he and Plaintiff orally discussed the matter.  (2/14/18 Letter, ECF No. 51 at Pg ID 987.)  In the meantime, Plaintiff submitted a written appeal to Theatre Department Chair John Wolf, dated December 19.  (Appeal Letter, ECF No. 44-22.)  Wolf denied the appeal in a December 20 email to Plaintiff.  (12/20/17 Email, ECF No. 44-23.)

Plaintiff next submitted a written appeal to Loraleigh Keashly, Associate Dean of CFPCA, on January 12, 2018.  (1/12/18 Appeal Letter, ECF No. 44-24.)  In response, Keashly collected information from Barnes, Dion, Turski, and Frost, reviewed the syllabi for Barnes' and Dion's courses, conducted an in-person meeting with Plaintiff, Plaintiff's father, and Frost, and received any additional information and documentation Plaintiff wished to submit.  (Keashly Dep. at 15, 31, 47, 203, ECF No. 44-20 at Pg ID 470-71, 473; Pl. Dep. at 181, ECF No. 44-3 at Pg ID 362.)  On February 18, Keashly sent Plaintiff a letter, indicating that she found no basis to change his grades or overturn the decision to dismiss him from the program.  (2/18/18 Letter, ECF No. 44-25.)

In her letter, Keashly advised Plaintiff that he could appeal her decision to the provost.  (*Id.*)  Plaintiff did not avail himself of that final step in the appeal process.  (Pl. Dep. at 206, ECF No. 44-3 at Pg ID 364.)

## III. Applicable Law and Analysis

As indicated at the start, Plaintiff asserts the following claims against Defendants: (1) disability discrimination and a failure to accommodate in violation of the ADA; (2) disability discrimination in violation of the Rehabilitation Act; (3) race and disability discrimination in violation of ELCRA; (4) retaliation in violation of ELCRA; (5) violations of his Fourteenth Amendment substantive and procedural due process rights; and (6) race discrimination in violation of Title IX. He is suing the individual defendants in both their individual and official capacities.

### A. ELCRA "Disability" Discrimination and Title IX "Race" Discrimination

In response to Defendants' argument that disabilities are not protected under ELCRA and that race is not covered under Title IX, Plaintiff concedes these points either expressly (*see* Resp. Br. at 25, ECF No. 50 at Pg ID 708 (acknowledging that disability is not a protected status under ELCRA)), or by failing to respond to Defendants' arguments, *see Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This [Circuit]'s jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). Plaintiff indicates that he intended to assert these disability and race discrimination claims under Michigan's Persons with Disabilities Civil Rights Act and Title VI of the Civil Rights Act,

respectively. (*See* Resp. at 1, 25-26, ECF No. 50 at Pg ID 684, 708-09.) Yet, at no time in this litigation, including in response to Defendants' motion, has Plaintiff moved to file an amended complaint. The Court refuses to address claims not currently pled.[3]

The claims Plaintiff has asserted fail for the reasons Defendants state. Disability is not a protected status under ELCRA. *See* Mich. Comp. Laws § 37.2101 (prohibiting discrimination "because of religion, race, color, national origin, age, sex, height, weight, familial status, or marital status"). And race is not protected under Title IX. *See* 20 U.S.C. § 1681(a) (emphasis added) ("No person

---

[3] Moreover, the PWDCRA "substantially mirrors the ADA" and "claims under both statutes are generally analyzed identically." *Henderson v. Chrysler Grp., LLC*, 610 F. App'x 488, 497 (6th Cir. 2015) (quotation marks and citations omitted). Similarly, the elements of Plaintiff's ELCRA claim and intended Title VI claim are the same. *See In re Rodriguez*, 487 F.3d 1001, 1008 n. 2 (6th Cir. 2007) (citing *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-21 (Mich. 2001) (applying the Title VII burden-shifting model to ELCRA claims)); *Brewer v. Bd. of Trustees of Univ. of Ill.*, 479 F.3d 908, 921 (7th Cir. 2007) (stating that the elements of a prima facie case of intentional discrimination under Title VI and VII are the same); *Fuller v. Rayburn*, 161 F.3d 516, 518 (8th Cir. 1998) (citing *Quarles v. Oxford Mun. Separate Sch. Dist.*, 868 F.2d 750, 754 n.3 (5th Cir. 1989); (*Hankins v. Temple Univ.*, 829 F.2d 437, 438, 440-43 (3d Cir. 1987)) (same). As discussed *infra*, Plaintiff's pending claims do not survive summary judgment and thus his intended claims would not, either. Further, courts consistently interpret Title VI as providing no individual liability. *See, e.g., Buchanan v. City of Bolivar, Tenn.*, 99 F.3d 1352, 1356 (6th Cir. 1996) (concluding that the plaintiff's Title VI claim failed because she sued individual defendants and not the entity allegedly receiving the financial assistance); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1169 (11th Cir. 2003); *Whitfield v. Notre Dame Middle Sch.*, 412 F. App'x 517, 521 (3d Cir. 2011); *Taylor v. Univ. Hospitals of Cleveland*, No. 1:20-cv-2455, 2021 WL 243189, at *5 (N.D. Ohio Jan. 25, 2021) (collecting cases).

in the United States shall, *on the basis of sex*, be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under any education

program or activity receiving Federal financial assistance . . ..").  The Court

therefore grants summary judgment to Defendants on these claims.

### B.      ELCRA and § 1983 Official Capacity Claims

Defendants argue that Plaintiff's ELCRA claims (Counts III and IV) against

WSU and the individual defendants in their official capacities are barred by

Eleventh Amendment immunity.  (Defs. Br. in Support of Mot. at 18, ECF No. 44

at Pg ID 296.)  Defendants further argue that neither WSU nor the individual

defendants in their official capacities are "persons" subject to suit for purposes of

Plaintiff's due process claims under § 1983.  (*Id*. at 23, Pg ID 301.)  Plaintiff fails

to address either argument, instead addressing arguments Defendants have not

raised: that the Eleventh Amendment does not bar his ADA or Rehabilitation Act

claims.  (*See* Pl. Resp. Br. at 27-28, ECF No. 50 at Pg ID 710-11.)

As Defendants correctly argue, the Eleventh Amendment shields universities

that are arms of the State, such as WSU, from state law claims asserted in federal

court.  *See, e.g.,  Estate of Ritter v. Univ. of Mich.*, 851 F.2d 846, 849 (6th Cir.

1988) (holding that the University of Michigan is an arm of the State and entitled

to Eleventh Amendment immunity); *see also Kreipke v. Wayne State Univ.*, 807

F.3d 768, 776-81 (6th Cir. 2015) (concluding that WSU is an arm of the State and

not subject to liability under the False Claims Act by applying the same arm-of-state analysis used for purposes of Eleventh Amendment immunity).  The Eleventh Amendment also confers immunity on state officials sued in their official capacities.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons.  But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself."); *McCormick v. Miami Univ.*, 693 F.3d 654, 662 (6th Cir. 2012) (holding that the plaintiff's claims for monetary damages against university officials in their official capacities are barred by the Eleventh Amendment).

"To state a § 1983 claim, a plaintiff must allege that a person acting under color of state law deprived the plaintiff of a right secured by the Constitution or federal law."  *Massingill v. Ohio Adult Parole Auth.*, 28 F. App'x 510, 511 (6th Cir. 2002) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149, 155-57 (1978)).  Neither states nor state officials sued in their official capacities are "persons" subject to suit under § 1983.  *Id.* (citing *Will*, 491 U.S. at 66-71).  Thus, as Defendants also correctly argue, WSU and the individual defendants in their official capacities are entitled to summary judgment with respect to Plaintiff's § 1983 claim.

C.     **Disability Discrimination in Violation of the ADA and
       Rehabilitation Act**

The ADA and Rehabilitation Act prohibit discrimination against disabled

individuals.  Title II of the ADA provides that "no qualified individual with a

disability shall, by reason of such disability, be excluded from participation in or

be denied the benefits of the services, programs, or activities of a public entity, or

be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section

504 of the Rehabilitation Act provides that a qualified individual with a disability

shall not, "solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under

any program or activity receiving Federal financial assistance."  29 U.S.C.

§ 794(a).  To establish a violation of either statute, the challenged discrimination

must have occurred "*because of* disability[.]"  *Gohl v. Livonia Pub. Schools Sch.*

*Dist.*, 836 F.3d 672, 682 (6th Cir. 2016) (emphasis in original).  However, to prove

a Rehabilitation Act claim, the plaintiff must show that the discrimination was

done "'*solely* by reason of' the disability."  *Id*. (quoting *G.C. v. Owensboro Pub.*

*Sch.*, 711 F.3d 623, 635 (6th Cir. 2013)) (emphasis added in *Gohl*).

In cases lacking direct evidence of discrimination, such as this one, the

traditional burden-shifting framework set forth in *McDonnel Douglas Corp. v.*

*Green*, 411 U.S. 792, 802-04 (1973), applies.  *Gohl*, 836 F.3d at 682.  The plaintiff

must first establish a prima facie case of discrimination.  *Id.*  If the plaintiff

20

succeeds, the burden shifts to the defendant to demonstrate a "legitimate,

nondiscriminatory" explanation for its actions.  *Id.* at 683.  If the defendant

establishes such a reason, the burden returns to the plaintiff to show that the stated

reasons are a pretext for unlawful discrimination.  *Id.*

> A prima facie case of discrimination requires proof that the plaintiff:
>
> (1) is disabled under the statutes, (2) is "otherwise qualified" for
> participation in the program, and (3) "is being excluded from
> participation in, denied the benefits of, or subjected to
> discrimination" because of his disability or handicap, and (4) (for
> the Rehabilitation Act) that the program receives federal financial
> assistance.

*Id.* (quoting *G.C.*, 711 F.3d at 635).  A person is "otherwise qualified" if the person

can meet the program's necessary requirements with or without reasonable

accommodation.  *Gati v. Western Ky. Univ.*, 762 F. App'x 246, 250 (6th Cir. 2019)

(citing *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir.

1998)).  The third prong of the plaintiff's prima facie case requires proof "that

similarly situated non-protected students were treated more favorably."  *Gohl*, 836

F.3d at 683 (citation omitted); *see also Clemons ex rel. T.W. v. Shelby Cnty. Bd. of

Educ.*, 818 F. App'x 453, 465 (6th Cir. 2020).  Defendants maintain that Plaintiff

cannot establish a prima facie case of discrimination because he is not "otherwise

qualified" and fails to show that any similarly-situated, non-disabled student was treated differently.[4]

In response, Plaintiff asserts that he is otherwise qualified arguing, in part, that his unstable blood sugar levels which caused his tardiness and absences were temporary and that he only needed time to stabilize them. (Pl. Resp. Br. at 25, ECF No. 50 at Pg ID 708.) Plaintiff argues that "[a] temporary diabetic crisis certainly does not mean that [he] was 'not otherwise qualified' to participate in the CFPCA program . . .." (*Id.*) Plaintiff cites no authority supporting his assertion that an individual is "otherwise qualified" if the individual suffers a condition resulting from a disability that renders the individual unqualified, but the condition is only temporary. Defendants, on the other hand, do not respond to Plaintiff's assertion in reply. Nevertheless, the Court finds it unnecessary to decide whether Plaintiff satisfies this prong of his prima facie case because he does not address Defendants' additional argument that he fails to satisfy the third prong.

Plaintiff does not dispute that he exceeded the number of absences and late arrivals permitted in Voice I and Movement I. Plaintiff also does not dispute that

---

[4] In the section of their brief addressing their legitimate, non-discriminatory reasons and pretext, Defendants argue that "[P]laintiff cannot show that attendance, assignment due dates or other policies were applied differently to him as to any other student, or that any other students had a similar academic or attendance record but were treated differently." (*See* Defs. Br. in Supp. of Mot. at 17, ECF No. 44 at Pg ID 295.) The Court will discuss this argument in the context of Plaintiff's prima facie case, as Sixth Circuit precedent indicates that it fits there.

he failed to turn in one journal and a performance review and submitted another performance review after the last Movement I class. While Plaintiff asserts that Dion and Barnes should have excused these violations because they resulted from his diabetes and that their unwillingness to do so was "unfair," unfairness does not establish a prima facie case of discrimination. To establish the third element of his prima facie case, Plaintiff must show that Defendants treated similarly-situated, non-disabled students differently. He makes no attempt to do so. Therefore, he fails to establish a prima facie of disability discrimination in violation of the ADA or the Rehabilitation Act. But even if Plaintiff succeeded in establishing his prima facie case, he fails to show that Defendants' legitimate, non-discriminatory reasons for their actions were a pretext for discrimination.

Plaintiff may demonstrate pretext by showing that Defendants' stated reasons (1) had no basis in fact, (2) did not actually motivate the grade or dismissal decisions, or (3) were insufficient to motivate the grades or dismissal decisions. *Jones v. Potter*, 488 F.3d 397, 406 (6th Cir. 2007). As stated above, Plaintiff does not dispute that he was absent from and tardy to Voice I and Movement I on the occasions indicated by Barnes and Dion, and he does not dispute that he failed to turn in a journal and one performance review in Movement I. Plaintiff argues, however, that the other performance review was not late because it was submitted before the end of the last day Movement I met and that, in any event, his

23

accommodations required Dion to accept both performance reviews beyond the due date.

The syllabus for Movement I, however, clearly stated that the performance reviews were due, at the latest, on the last day of class, "printed and submitted *in class . . ..*" (Movement I Syllabus, ECF No. 44-8 at Pg ID 404 (emphasis added).) The class met for the last time, before the final exam, from 4:30-5:20 p.m. on December 11. (*See id*. at Pg ID 401, 413.) Plaintiff's submission of one of the reviews at 11:08 p.m., via email, was at the very least late.[5] Dion did not violate Plaintiff's accommodations by not accepting his assignments late.

The accommodations granted to Plaintiff allowed him "to *request*" "extended time on written assignments *due to the needs of his condition*" and that such requests needed "to be *discussed with* [the] professor." (Accommodations Letter, ECF No. 44-6 at Pg ID 393 (emphasis added).) First, there is no indication that Plaintiff's disabilities caused him to submit the Movement I assignments late or not at all. Plaintiff never communicated to Dion—and in fact has not shown here—that the assignments were late or not submitted due to problems associated with his diabetes. Plaintiff's emails to Dion in fact reflect that factors completely

_____

[5] Plaintiff asserts in his email to Dion that his accommodations allow "for all work to be completed and submitted electronically." (12/11/17 Email, ECF No. 53-2 at Pg ID 1512.) Such an accommodation appears nowhere in the accommodations letter Plaintiff received from SDS. (Accommodations Letter, ECF No. 44-6 at Pg ID 393.)

24

unrelated to his disabilities were the cause (i.e., not realizing that he needed to attach the ticket to the review).  Second, the accommodations clearly neither permit Plaintiff to unilaterally decide that he will receive an extension nor allow for an automatic extension upon the occurrence of needs due to his condition.  In any event, the accommodations require a discussion with the professor first.  This, Plaintiff did not do.

Plaintiff argues pretext based on the fact that he was dismissed after only one semester and without being provided a second chance.  He asserts that "[i]f Defendants['] reason for dismissing Plaintiff were [sic] non-discriminatory . . . they would have offered him an opportunity to raise his performance."  (Pl. Resp. Br. at 22, ECF No. 50 at Pg ID 705.)  But there is no basis for Plaintiff to make this leap and there would be no basis for a jury to reach it, either.[6]

Plaintiff also argues that a jury could "infer pretext because he was dismissed from the program with absolutely no warning whatsoever."  (*Id.*)  However, Plaintiff's assertion that he was not warned is contradicted by the record.  He undisputedly received the syllabi for Voice I and Movement I which set forth

---

[6] Plaintiff asserts that "[i]n all of the cases reviewed by [him] in which [summary judgment] was granted in favor of a [d]efendant university in cases alleging disability discrimination, the [p]laintiff had been given multiple chances over a *much* longer period of time."  (Pl. Resp. Br. at 21-22, ECF No. 50 at Pg ID 704-05 (emphasis in original).)  However, Plaintiff does not name or offer a citation for any of these cases.  He also does not cite authority holding that the failure to provide multiple chances or more time to improve is evidence of discrimination.

25

the course requirements and attendance policy, including the reduction of a student's grade for excessive absences or late arrivals. In the syllabus for Movement I, Dion informed her students that their performance reports constituted 15% of their grades and of the requirements and deadline for the reports, including that "[n]o late reports will be accepted." (ECF No. 44-8 at Pg ID 402-04.) Moreover, Barnes reminded Plaintiff on several occasions that further absences would impact his grade.

The Ropes contemplates a "warning procedure . . . consisting of conferences along with written evaluations explaining how the potentially failing work must be corrected" when a student is failing, and this procedure was not explicitly followed in Plaintiff's case. The Sixth Circuit has held that a jury is entitled to consider the failure to follow internal policies as evidence of pretext. *See, e.g.*, *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 126 (6th Cir. 2007); *Deboer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005). Defendants maintain, however, that the Ropes' procedure was inapplicable to Plaintiff's situation, except with respect to his absences and late arrivals (for which they maintain warnings and conferences were provided) because his failing status only became apparent at the end of the semester when final grades were calculated. In other words, Defendants argue that this was not a situation where it was apparent during the semester that the student was failing such that there was an opportunity

to confer, provide written evaluations, and correct the failing work.  (*See* Barnes

Dep. at 31, 50, ECF No. 53-1 at Pg ID 1436, 1455; Dion Dep. at 88, ECF No. 44-9

at Pg ID 425; Keashly Decision at 2, ECF No. 44-25 at Pg ID 500.)

In any event, even if Defendants violated WSU policy in their handling of

Plaintiff's grades or dismissal, a reasonable jury could not conclude from that

mishandling that Defendants' reasons for the grades or dismissal lacked a basis in

fact.  As addressed above, Plaintiff does not dispute the absences and late arrivals

that led to his failing grade in Barnes' course or his exam grade that contributed to

his failure in Dion's course.  As also addressed above, Plaintiff does not dispute

that he failed to turn in an assignment and turned another assignment in beyond the

due date stated in the Movement I syllabus.  The Court already rejected Plaintiff's

arguments for why Dion should have excused these untimely or absent

assignments.

Plaintiff has not explained how the alleged failure to follow the Ropes policy

could lead a reasonable juror to conclude that Defendants' reasons for failing

Plaintiff and dismissing him from the program did not motivate the decision or

were insufficient to motivate the decisions.  Notably, Plaintiff offers no evidence

that the policy was adhered to when students outside of his protected class were

failing or being dismissed.  A defendant's "failure to follow internal disciplinary

protocols is most probative when coupled with evidence that the [defendant]

27

followed the protocols for people outside of [the] plaintiff's protected class." *See Sims-Madison v. Dana Com. Vehicle Mfg., LLC*, No. 21-5706, 2022 WL 898770, at *4 (6th Cir. Mar. 28, 2022) (quoting *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 846-47 (6th Cir. 2015)); *see also Miles v. S. Cent. Hum. Resources Agency, Inc.*, 946 F.3d 883, 896 (6th Cir. 2020) (rejecting the plaintiff's argument that the defendant's failure to follow internal policy demonstrated pretext where the plaintiff failed to show any employee, "let alone one outside the protected class, against whom [the defendant]'s policy was applied differently").

Notably, Plaintiff does not cite a single case in support of his argument that the policy violation is evidence of pretext—much less an analogous case. (*See* ECF No. 50 at Pg ID 693-94.) Based on its own review of the relevant case law, the Court struggles to conceive of how any violation of the policy in this case undermines the stated motivations for failing and dismissing Plaintiff.

The present case is distinguishable from *DeBoer*, where the Sixth Circuit found that the defendant's failure to warn the plaintiff of her purported poor performance until after she announced her pregnancy suggested that her poor performance had been contrived. 124 F. App'x at 394. Moreover, in *DeBoer*, the failure to counsel the plaintiff in accordance with the defendant's internal policies was only one of several factors supporting pretext and, even in combination, the Sixth Circuit found that those factors "barely qualified to demonstrate pretext[.]"

28

In *Colburn*, the defendant failed to follow its policy's stated preference of laying off temporary employees first during a reduction in force when it selected the plaintiff for termination, thus permitting an inference that an impermissible factor (age) went into the decision to select the plaintiff. 238 F. App'x at 126. Unlike *Colburn*, the Ropes policy is wholly disconnected from the stated reasons for failing and dismissing Plaintiff. In other words, the alleged failure to follow the Ropes process in no way suggests that Defendants' reasons for failing and dismissing Plaintiff were manufactured. But again, the Sixth Circuit has repeatedly stated that, on its own, a defendant's "failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *Sims-Madison*, 2022 WL 898770, at *4 (quoting *Miles*, 946 F.3d at 896); *Stokes v. Detroit Pub. Schs.*, 807 F. App'x 493, 501 (6th Cir. 2020) )citing *Jenkins v. Nashville Pub. Radio*, 106 F. App'x 991, 995 (6th Cir. 2004)).

Plaintiff also refers to Keashly's testimony that "Barnes accused Plaintiff of using his disease as an 'excuse,'" which, according to Plaintiff, shows Barnes' "underlying discriminatory animus towards Plaintiff based on his disability." (Pl. Resp. Br. at 22, ECF No. 50 at Pg ID 705; *see also* Keashly Dep. at 61, ECF No. 50-1 at Pg ID 825.) Barnes purportedly made this statement to Keashly during her review of Plaintiff's appeal. (*See* ECF No. 51-1 at Pg ID 995.) The context in which the view was expressed and what Barnes meant by it is not evident from the

29

record.  In any event, the statement alone does not demonstrate that the reasons why Plaintiff received a failing grade in Voice I (1) had no basis in fact, (2) did not actually motivate the grade, or (3) was insufficient to motivate the grade.

To further show pretext, Plaintiff claims that Defendants ignored their own policy when dismissing him from the program, conducted a "rushed and very sloppy appeals process," and that Dion ignored his written accommodations for extended time to complete assignments.  (*Id.* at 23-24, Pg ID 706-07.)  Plaintiff further asserts that "Defendant Wolf peer pressured Defendant Barnes into denying the appeal[.]"  (*Id.* at Pg ID 691; *see also id.* at Pg ID 701.)  As discussed in part already, however, and as will be discussed below with respect to Plaintiff's due process claim, Plaintiff's characterizations are not supported by the record.

Lastly, Plaintiff maintains that pretext is established by Defendants' failure to treat him with leniency in their attendance policies under the circumstances (e.g., his success in his other classes, the fact that he had an accommodation for absences while an undergraduate student, that his "diabetic crisis" was temporary).  (*Id.* at 23, Pg ID 706.)  Yet Plaintiff's belief that Defendants treated him unfairly does not demonstrate that their conduct was discriminatory.  In other words, unfairness is not necessarily discrimination.  Plaintiff fails to cite any examples of similarly-situated, non-disabled students being treated more leniently.

Plaintiff essentially is asking the Court to conclude that his performance did not justify the grades he received and, therefore, Defendants' actions must have been motivated by disability discrimination. But the Court would have to second-guess Defendants' academic decisions to reach that conclusion. In other words, the Court would have to weigh in on whether a student who misses class or arrives late in violation of the course attendance policy and turns in assignments late or not at all should receive a failing grade. Yet the Supreme Court and Sixth Circuit have instructed that academic decisions must be afforded great deference. *See, e.g., Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (quotation marks and citations omitted) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation."); *Kaltenberger*, 162 F.3d at 436 (quoting *Ewing*, 474 U.S. at 225) (advising that "courts 'should show great respect for the faculty's professional judgment'"); *Gati*, 762 F. App'x at 250-51 (quoting *Kaltenberger*, 162 F.3d at 436) (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988)) (acknowledging "that the 'federal judiciary is ill equipped to evaluate the proper emphasis and content of a school's curriculum'" and "[r]ight or wrong, [a court] must defer to [the school's] considered academic judgment . . .") "[F]ederal courts [are] unsuited 'to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public

31

educational institutions.'" *Doherty*, 862 F.2d at 576 (quoting *Ewing*, 474 U.S. at 226).

For these reasons, the Court concludes that Defendants are entitled to summary judgment with respect to Plaintiff's disability discrimination claims under the ADA and Rehabilitation Act.

### D.    Failure to Accommodate

Within Count 1 of his Complaint, Plaintiff appears also to be alleging a failure to accommodate claim under the ADA.  (*See* Compl. ¶ 104, ECF No. 1 at Pg ID 18.)  To establish such a claim, Plaintiff must show (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the MFA program, with or without reasonable accommodation; (3) Defendants knew or had reason to know about his disability; (4) he requested an accommodation; and (5) Defendants failed to provide the necessary accommodation.  *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011).

Plaintiff cannot prove his claim because he did not request an accommodation for absences or late arrivals before he was dismissed from the MFA program.  *See Stanciel v. Donahoe*, 570 F. App'x 578, 583 (6th Cir. 2014) (citing cases) ("It is well settled . . . that reasonable accommodation is not at issue if the plaintiff has never requested accommodations.")  While one judge in this District found an exception to this rule, *see Maloney v. Home Depot U.S.A., Inc.*,

No. 11-10924, 2012 WL 1957627, at *14 (E.D. Mich. May 31, 2012), the Sixth

Circuit has declared that this exception is not the law in the Circuit, *Stanciel*, 570

F. App'x at 584.  In any event, this exception only applies where the plaintiff

shows that "the nature of the disability impairs the employee's ability to request an

accommodation." *Maloney*, 2012 WL 1957627, at *14.  Plaintiff's disability did

not prevent him from requesting accommodations and the record undisputedly

reflects that he was able to do so throughout his academic career.

Defendants, therefore, are entitled to summary judgment with respect to this

claim.

### E.    Race Discrimination

The *McDonell-Douglas* burden-shifting framework also applies to Plaintiff's

race discrimination claim under ELCRA, as he lacks direct evidence that

Defendants' actions were based on his race.  *White v. Baxter Healthcare Corp.*,

533 F.3d 381, 391 (6th Cir. 2008).  And like his prima facie case to show disability

discrimination, Plaintiff must show that he was "treated differently than similarly

situated non-protected [students]." *Id*. (citations omitted).  For the reasons

discussed with respect to Plaintiff's disability discrimination claims, he fails to

offer such proof.  Furthermore, Plaintiff presents no evidence that Defendants

engaged in any behavior that could be construed as racially discriminatory which

in turn influenced Defendants' grading or dismissal decisions.

33

In his response brief, Plaintiff does not specify what evidence supports his race discrimination claim but simply cites to a 73-page range of his deposition transcript, presumably expecting the Court to search those pages for supporting evidence.  (Pl. Resp. Br. at 26-27, ECF No. 50 at Pg ID 709-10 (citing Pl. Dep. at 157-230, ECF No. 53-12 at Pg ID 1705-78).)  While the Court is not obligated to search for evidence supporting Plaintiff's claim, *see, e.g., Street*, 886 F.2d at 1479-80, the Court reviewed the entire transcript from Plaintiff's deposition so as not to penalize him for his attorney's errors.  Contrary to the assertion in Plaintiff's response brief (Pl. Resp. Br. at 26, ECF No. 50 at Pg ID 709), there is not "extensive[]" testimony about the racial discrimination he or other students in the program suffered, and the incidents he describes do not support his claim that he was dismissed from the program because of his race rather than due to his grades.

Plaintiff discussed a comment concerning his hairstyle made by former CFPCA senior faculty member and head of costuming, John Woodland, who was named as a defendant in this lawsuit but was subsequently dismissed when he passed away.  (Pl. Dep. at 187-88, ECF No. 53-12 at Pg ID 1735-36.)  However, there is no evidence connecting that comment to Plaintiff's failing grades or dismissal from the program.  In other words, Plaintiff fails to establish a causal connection between Woodland's conduct and those of Defendants.  Nor is there an evident correlation between Plaintiff's grades and dismissal and the "systemic

34

racism" Plaintiff described and asserted was reflected in the casting of leading parts and the stage on campus where African American plays or plays written by African American playwrights were performed.[7] (*Id*. at 184-85, Pg ID 1732-33.)

When asked who he believes improperly considered race as a factor in his grades or dismissal, Plaintiff responded: "I can't say for sure, but I know the person who had the most say would have been Defendant Wolf because he was the chair of the department." (*Id*. at 158, Pg ID 1706.) Yet there is no evidence that Wolf played a role in the grade Plaintiff received in Voice I or Movement I. He simply upheld those grades on appeal. Additionally, Plaintiff offers no specifics as to why he believes Wolf considered race in his decision. In fact, Plaintiff testified that neither Wolf nor any of the individual defendants ever said anything suggesting that race was a factor in their treatment of Plaintiff. (*Id*. at 208-211, Pg ID 1756-59.)

During his deposition, Plaintiff spoke about the low number of African American students in the theatre program; however, he acknowledged that four of the ten students in his class and the class before his were African American. (*Id*. at 218, Pg ID 1766.) Except for Plaintiff, none of these students involuntarily left the

---

[7] Notably, Plaintiff was cast in a lead part during the one semester he was in the theatre program. (Pl. Dep. at 133-34, ECF No. 53-12 at Pg ID 1681-82.)

program. (*Id*. at 217, Pg ID 1765.) And according to Plaintiff, the university was "aggressively recruiting African American students[.]" (*Id*. at 215, Pg ID 1763.)

As Plaintiff fails to demonstrate that he was treated differently than similarly situated students outside the protected class, Defendants are entitled to summary judgment with respect to Plaintiff's race discrimination claim.

## F. Retaliation

Plaintiff must demonstrate four elements to establish a prima facie case of retaliation under ELCRA: (1) he "engaged in protected activity"; (2) Defendants were "aware of the protected activity"; (3) Defendants "took an action that was 'materially adverse' to" Plaintiff; and (4) "there is a causal connection between [Plaintiff]'s protected activity and [Defendants'] adverse action." *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 343-44 (6th Cir. 2021) (citations omitted). A materially adverse action is one that would "dissuade a reasonable [student] from making or supporting a charge of discrimination." *Jordan v. City of Cleveland*, 464 F.3d 584, 594 (6th Cir. 2006) (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).

Defendants argue that Plaintiff never engaged in protected activity before receiving the failing grades and being dismissed from the MFA program. Plaintiff does not dispute this. Instead, he responds that his retaliation claim is premised on Defendants' performance of "a bogus 'investigation' of [his] legitimate appeal" in

response to his assertion that he was being discriminated against based on his disability and race. (Pl. Resp. Br. at 29, ECF No. 50 at Pg ID 712.) Plaintiff told Keashly and Frost that if his appeal was denied, he intended to file a federal lawsuit against Defendants. (*Id.*) However, it was Barnes' and Dion's grades and the resulting dismissal that caused Plaintiff harm, not the rejection of his appeal. The appeal dismissal simply upheld the grades and dismissal. A plaintiff cannot demonstrate causality to support a retaliation claim where an adverse decision already was contemplated or made before the plaintiff engaged in the alleged protected activity. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (holding that, where an employer contemplated transferring an employee before the employer learned that the employee filed a Title VII suit, the employer's decision to proceed "along the lines previously contemplated, though not yet definitively determined," did not establish evidence of causality); *McElroy v. Philips Med. Sys.*, 127 F. App'x 161, 170-71 (6th Cir. 2005) (finding no inference of causal connection where discharge was contemplated and underway before the plaintiff engaged in the alleged protected activity).

In any event, Plaintiff offers no evidence to establish a causal connection between his protected activity and the decision to uphold the failing grades and dismissal. And for the reasons discussed earlier, Defendants demonstrate legitimate reasons for their actions and Plaintiff fails to show pretext.

37

For these reasons, Defendants are entitled to summary judgment with respect to Plaintiff's retaliation claim.

## G.   Substantive Due Process

Plaintiff alleges that Defendants violated his substantive due process right to continued enrollment in the MFA program.  The fundamental rights protected by the Fourteenth Amendment's substantive due process clause are narrow and more restricted than the rights protected by procedural due process.  *Range v. Douglas*, 763 F.3d 573, 588 & n.6 (6th Cir. 2014) (citing *Bell v. Ohio State Univ.*, 351 F.3d 240, 249-50 (6th Cir. 2003)).  Neither the Supreme Court nor the Sixth Circuit have found that continued enrollment in a graduate program constitutes a fundamental right.  In the two cases cited by Plaintiff, the Supreme Court and Sixth Circuit merely assumed, without deciding, that such a right exists.  *Ewing*, 474 U.S. at 222 ("accept[ing] the University's invitation to assume the existence of a constitutionally protectible right in Ewing's continued enrollment") (brackets and quotation marks omitted); *Ku v. Tennessee*, 322 F.3d 431, 435 (6th Cir. 2003) ("[W]e will assume without deciding that Raymond Ku has a constitutionally protectible property interest in continuing his medical studies under Tennessee law.").  To the contrary, the Sixth Circuit has held that, absent an equal protection violation, a graduate student has no interest in continuing his or her education that is protected by substantive due process.  *Bell*, 351 F.3d at 251.

38

The Supreme Court in *Ewing* and the Sixth Circuit in *Bell* and *Ku*, rejected the student's substantive due process claims, concluding that any protected right had not been violated because the university's actions did not "constitute a substantial departure from accepted academic norms [n]or were otherwise taken in bad faith." *See Ewing*, 474 U.S. at 225-27; *Bell*, 351 F.3d at 251; *Ku*, 322 F.3d at 438. In reaching this decision, the Supreme Court and Sixth Circuit advised that "courts 'should show great respect for the faculty's professional judgment' and 'may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.'" *Ku*, 322 F.3d at 438 (quoting *Ewing*, 474 U. S. at 225). As the Supreme Court and Sixth Circuit further pointed out:

> . . . courts are ill-suited to "evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions—decisions that require 'an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial or administrative decisionmaking.'"

*Bell*, 351 F.3d at 251 (quoting *Ewing*, 474 U.S. at 226) (quoting *Bd. of Curators of the Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89-90 (1978)).

Affording Defendants such deference, this Court must grant them summary judgment on Plaintiff's substantive due process claim, even if it assumes that substantive due process protects Plaintiff's interest in continuing in the MFA program. Plaintiff offers no evidence to suggest that Defendants' actions

"constitute[d] a substantial departure from accepted academic norms or were otherwise taken in bad faith." In Defendants' academic judgment, as reflected in their testimony, the Voice I and Movement I syllabi and The Ropes, regular attendance and the submission of timely assignments were critical components of the program and a student's performance. Additionally, grades below a "B-" in a graduate program were deemed unsatisfactory and translated to a failing grade, subjecting a student to dismissal. Plaintiff does not dispute that he was absent and late for many of his Voice I and Movement I classes and turned in assignments late, or not at all, in his Movement I course.

### H.  Procedural Due Process

To prevail on his procedural due process claim, "[P]laintiff must first establish the existence of a constitutionally protected life, liberty or property interest." *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 436 (6th Cir. 2006) (citing *Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992)). Where such an interest exists, a state educational institution satisfies a student's due process rights in the case of a dismissal for academic, as opposed to disciplinary,[8] reasons if (a) "the student has been fully informed of the

---

[8] The Supreme Court has recognized a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct." *Horowitz*, 435 U.S. at 86. The Supreme Court has further

faculty's dissatisfaction with the student's academic progress" and (b) "the decision . . . was careful and deliberate[.]" *Ku*, 322 F.3d at 436 (citing *Horowitz*, 435 U.S. at 85-86.) Academic decisions do not necessitate a hearing because, as stated in the previous section, those decisions "require an expert evaluation of cumulative information and are not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id*. (quoting *Horowitz*, 435 U.S. at 91). WSU's procedural rules do not establish the process due to Plaintiff. *Levine v. Torvik*, 986 F.2d 1506, 1515 (6th Cir. 1993), *overruled in part on other grounds by Thomposon v. Keohane*, 516 U.S. 99, 111 (1995) ("A state cannot be said to have a federal due process obligation to follow all of its procedures; such a system would result in the constitutionalizing of every state rule, and would not be administrable."); *JiQuiang Xu v. Mich. State Univ.*, 195 F. App'x 452, 457 (6th Cir. 2006) (explaining that the inquiry in deciding the plaintiff's due process claim was "not whether the University conformed to its own internal grievance procedures" but whether the plaintiff "was afforded the due process guaranteed under the Fourteenth Amendment"). This Court finds it unnecessary to analyze conflicting Sixth Circuit case law to decide whether Plaintiff had a property interest in his continued enrollment in the MFA program warranting procedural

---

recognized that "[t]his difference calls for far less stringent procedural requirements in the case of an academic dismissal." *Id.*

due process protection because he fails to show that Defendants did not afford him

the process due.[9]

      With respect to notice, Plaintiff maintains that he was dismissed from the

MFA program "with no warning whatsoever and in violation of WSU's own

policies[.]"  (Pl. Resp. Br. at 30, ECF No. 50 at Pg ID 713.)  The record

undisputedly reflects, however, that Plaintiff was warned—both in course syllabi,

The Ropes, and by Barnes and Dion—that his grades would be reduced by

excessive absences or late arrivals and that he could be dismissed for

unsatisfactory grades.  In written communications to Plaintiff and in meetings with

him, Barnes and Dion warned that his grades would be impacted by continued

---

[9] The Sixth Circuit has "held that the Due Process Clause is implicated by higher education *disciplinary* decisions."  *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (emphasis added); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017) (quoting *Cummins*, 662 F. App'x at 445) ("Suspension 'clearly implicates' a protected property interest, and allegations of sexual assault may 'impugn a student's reputation and integrity, thus implicating a protected liberty interest.'"); *see also Zwick v. Regents of Univ. of Mich.*, No. 06-12639, 2008 WL 1902031, at *4-5 (E.D. Mich. Apr. 28, 2008) (collecting cases reaching contrary results but concluding that the plaintiff had a protected property interest in not being dismissed from the university's dental school for academic reasons). However, in the context of an academic decision, the Sixth Circuit also has declared that "[t]he issue of whether a student's interest in continued enrollment at a post-secondary institution is protected by procedural due process has not been resolved."  *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 437 (6th Cir. 2006) (citing *Horowitz*, 435 U.S. at 84-85; *Bell*, 351 F.3d at 249).

absences, late arrivals, and late assignments.[10]  While Plaintiff only was informed that he had failed Voice I and Movement I at the end of the semester, this was because that determination was made only once Plaintiff's final grades were calculated.  (*See* Barnes Dep. at 31, 50, ECF No. 53-1 at Pg ID 1436, 1455; Dion Dep. at 88, ECF No. 44-9 at Pg ID 425; Keashly Decision at 2, ECF No. 44-25 at Pg ID 500.)  Again, as to any alleged failure to follow WSU's policies, the Sixth Circuit has repeatedly stated that violations of internal rules, such as a university's own procedures governing discipline, "do[] not establish a cognizable constitutional violation[.]"  *Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 309 (6th Cir. 1984) (citing *Horowitz*, 435 U.S. at 92 n.8); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 407 (6th Cir. 2017) (quoting *Doe v. Cummins* 662 F. App'x 437, 445 n.2 (6th Cir. 2016)) ("Plaintiff's rights are dictated by the Constitution, 'not internal school rules or policies.'").

Turning to the requirement that the decision "be careful and deliberate," the record belies Plaintiff's assertion that it was rushed and sloppy.  His grade appeal

---

[10] Plaintiff acknowledges that he was warned that additional absences or late arrivals would impact his grades but he claims that Defendants never advised him of the resulting danger of failing.  (Pl. Resp. Br. at 4-5, ECF No. 50 at Pg ID 687-88.)  However, the syllabi undeniably set forth the attendance policy, including that after two absences, "*every* absence thereafter will effectively lower the student's final grade one letter value (10%)" and "[t]hree late-arrivals equals one missed class."  Thus, the syllabi plainly explained that each time a student was absent, his or her grade would be reduced 10% and clearly, after enough absences, a student's grade could fall below a passing level.

was reviewed at multiple levels. Keashly did not, as Plaintiff asserts, take only a day to investigate his appeal and render a decision. Plaintiff submitted his appeal to Keashly on January 12, 2018. She issued her decision on February 15. Prior to making her decision, Keashly gathered information from multiple sources and spoke with a number of individuals. Notably, Plaintiff never disputed the basis for the grades. He simply claims that it was unfair of Barnes and Dion to give him those grades and unfair to dismiss him from the program as a result.

Similarly, there is no evidentiary support for Plaintiff's assertion that the decisions were a result of "peer pressure" or that Defendants "conspire[ed] together to deny the appeal." (ECF No 50 at Pg ID 701.) The only evidence Plaintiff offers to support these assertions is an email from Wolf to Barnes before Barnes issued his written rejection of Plaintiff's written appeal. (*Id.* (citing 12/25/17 Email, ECF No. 53-9 at Pg ID 1542).) No reasonable juror could conclude from the email, however, that Defendants were pressured into denying Plaintiff's appeal or conspired to do so. Notably, before this email was sent, Barnes had rejected Plaintiff's appeal orally. (*See* 2/14/18 Email, ECF No. 51 at Pg ID 987.)

Plaintiff had a fair and meaningful opportunity to be heard. *Horowitz*, 435 U.S. at 84-85. "The Fourteenth Amendment requires nothing more." *Bell*, 351

F.3d at 249.  Defendants therefore are entitled to summary judgment as to Plaintiff's procedural due process claim, as well.

## IV.    Conclusion

For the reasons stated, Plaintiff's ELCRA disability discrimination claim (Count 3) and Title IX race discrimination claim (Count 6) fail as a matter of law because the statutes do not protect disability and race, respectively.  Plaintiff's substantive due process claim (Count 5) also fails as a matter of law because neither the Supreme Court nor Sixth Circuit have recognized a fundamental right to a particular grade or continued graduate enrollment.  However, even if the Court assumes that such a right exists, it must afford great deference to Defendants' decisions as Plaintiff offers no evidence to suggest that those decisions were "a substantial departure from accepted academic norms."  Similarly, even if Plaintiff had a property interest in his continued enrollment, his procedural due process claim (Count 5) fails because there is no genuine issue that he was afforded the process due under the Fourteenth Amendment.

Plaintiff fails to establish a prima facie case of disability or race discrimination in violation of the ADA, Rehabilitation Act, or ELCRA (Counts 1-3).  He offers no evidence of a similarly-situated student outside these protected classes being treated differently.  Moreover, Defendants establish legitimate, non-discriminatory reasons for their actions and Plaintiff fails to show that those

45

reasons were pretextual.  His failure to accommodate claim fails because he never

requested an absence accommodation prior to being dismissed from the MFA

program.  Plaintiff also fails to establish a prima facie case of retaliation in

violation of ELCRA as he did not suffer an adverse action following his alleged

protected activity and he fails to establish a causal connection between his

discrimination complaints and the alleged adverse action.

    Accordingly,

    **IT IS ORDERED** that Defendants' Motion to Dismiss or for Summary

Judgment (ECF No. 44) is **GRANTED**.

    **IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: September 16, 2022

I hereby certify that a copy of the foregoing document was mailed to counsel of
record and/or pro se parties on this date, September 16, 2022, by electronic
and/or U.S. First Class mail.

s/Aaron Flanigan
Case Manager